## TENNANT v. PEORIA & PEKIN UNION RY. CO.

### No. 8128.

Circuit Court of Appeals, Seventh Circuit.

March 31, 1943.

Rehearing Denied May 13, 1943.

E. E. Horton, of Peoria, Ill., for appellant.

E. V. Champion, of Peoria, Ill., Mark D. Eagleton and Wm. H. Allen, both of St. Louis, Mo., for appellee.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

This is an appeal from a judgment in favor of plaintiff, entered in accordance with a jury verdict, in an action to recover damages resulting from the death of plaintiff's intestate while in the employment of defendant.

The action was brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. The amended complaint, so far as now material, alleged that Harold C. Tennant, plaintiff's intestate, while engaged in the scope of his duties and employment as a switchman on the defendant's train, was run over and crushed by said train, from which he sustained fatal injuries. Death was alleged to have been the result of defendant's negligence in whole or in part in two respects, (1) that the defendant in moving and switching its engine and cars failed to ring a bell, in violation of Rule 30 of certain rules and regulations then in effect, and (2) that the defendant failed and omitted to exercise ordinary care to discover the whereabouts of said Harold C. Tennant and negligently moved the engine and cars at a time when his whereabouts was unknown to the members of the switching crew.

The case was submitted to the jury solely upon the first charge of negligence. So far as the record before us discloses, no request was made for submission upon the second charge, and no complaint of the court's action in this respect is shown. Notwithstanding plaintiff's contention here that the proof requires an affirmance upon each of the charges, we are of the view that the case must be decided upon the charge which was submitted to and decided by the jury.

Defendant presents a number of contested issues, the most important of which is the court's refusal to direct a verdict in response to its motion made at the close of the plaintiff's, and renewed at the close of all the proof in the case. Under this issue, defendant contends (1) that proof of negligence was not sufficient to take the case to the jury, and (2) that in any event there was a total want of proof that any negligence shown was the proximate cause of decedent's injuries. Other issues of lesser importance are presented, including alleged error in the court's charge to the jury and its refusal to give special interrogatories submitted by the defendant, and the contention that the verdict was excessive and not in accordance with law.

At the time of his injury and death on July 12, 1940, Tennant was working as a member of a switching crew in one of defendant's East Peoria (Illinois) yards, known as the "B" yard. The crew consisted of Harkless, the foreman; England, the engineer or motorman; Cole, the fireman or motorman's helper; and two switchmen, Tennant and Bonner. Tennant, sometimes referred to as the "pin puller," was the switchman who followed the engine and Bonner was the field man. Tennant had been employed in this same capacity on the same crew for a number of months, and in the same yards for about four years. The crew went on duty at eleven o'clock at night and off at seven o'clock in the morning. One of the jobs which this crew performed regularly each night, and the one which it was engaged in performing on the night of the fatal occurrence, was the removal of cars from track B-28. In so doing, after certain other switching had been done, the engine (a Diesel, electrically operated) was brought down from the north through divide switch B-28 and onto track B-28. The front or pilot end of the engine was headed south. B-28 track south of B-28 switch was a straight track, extending substantially north and south. At this time there were twenty cars, in different groups, on this track. The job to be performed was the coupling together of these cars and moving them northwardly out of this track to assigned locations in the yards.

The brief for each side contains a lengthy statement of the circumstances surrounding the decedent's death. Inasmuch as the proof must be considered in the light most favorable to the plaintiff, we adopt her statement as to what occurred at and shortly prior to the time of the accident. As the engine moved south on track B-28, the engineer was in his cab on the right side (west side), the fireman in his cab on the opposite side, Tennant was riding on the right front footboard of the engine (on the engineer's side), and Harkless and Bonner had gone ahead, southwardly, down the track on the engineer's side. Harkless marked the empties and the loads and Bonner released the car brakes. Bonner made all the couplings except the first, that is, the coupling between the engine and the first car, which was made by Tennant. The engine was moved on signal from Bonner from time to time until the cars had all been coupled. It was dark and the signals were given by lantern. During this coupling work, the engine had stopped and started some six or eight times. When the coupling had been finished, Harkless and Bonner were at the south end of the train on the engineer's side. Harkless gave the engineer a back-up signal, which meant that the engineer was to back northwardly and pull the cars out of track B-28. At that time, neither Harkless nor Bonner saw Tennant's light. The engineer, in response to Harkless' signal, put his engine in motion, backing it and pulling the cars northwardly. No bell was rung for this or any of the other movements had in the operation which took place on track B-28.

"England, the engineer, was the last man to see Tennant alive. He testified that when he had made the last southward movement in coupling up the cars on track B-28 Tennant was standing alongside of the engineer's cab, on the west side of the track, putting his raincoat under the cab in a compartment there; that it had been raining that night, and that when Tennant put his raincoat in this compartment he got out his cap and jacket and put them on and then walked around to the north or rear of the engine, and that was the last the engineer saw of him. England testified that when Tennant passed around the engine, out of his vision, the engine was five or six car lengths south of divide B-28 switch; a car being about forty feet long. He said he stood there five or ten minutes, waiting for a signal, and when he got the back-up signal from the rear end he backed up and kept on backing all the way out upon the lead. He said he pulled the cars out on the middle lead, or Nickel Plate lead, far enough so that the rear end of the train would clear No. 41 switch, the next operation being for someone to throw No. 41 switch so that he could go back down the track after getting a signal for the movement; that he expected to get a signal from Tennant at that point but did not get it. He said this was the regular routine of work every night; that Tennant, when on the job, after making the first coupling would walk around the north end of the engine as he did on this occasion; that the foreman would give the signal to back up and pull up on the lead, and then the foreman and field man would cut across to the hammer track to line some switches there and he would back up on the lead and Tennant would finally show up at the B-41 switch and give him a signal to come ahead through that switch.

"England further testified that on the night of July 12, 1940, when he got the back-up signal on track B-28 and began to back up, he did not ring the bell; did not ring it until he 'got down to the crossing.' He said he did not know where Tennant was when he started the engine; that when he received this back-up signal he was looking forward, to the south, and he could have seen anyone on the front footboard, but did not see Tennant; that he could not see any one on the back footboard.

"The train backed up some fifty car lengths, out of track B-28 onto the lead track, moving north and west into another part of the yard, and stopped on the lead beyond switch No. 41 and there waited a while before it was discovered that Tennant was missing. Harkless and Bonner had ridden a distance up track B-28, each on a car of the train, and had then proceeded west across to the repair track to line switches. When the train did not return Harkless walked up the lead track on which it was standing until he reached the engine, and asked the engineer where Tennant was, and the engineer told him he did not know. Harkless then threw the switch to go back from the lead into track B-28, saying they would look for Tennant. The engine was thereupon disconnected from the cars and proceeded back into and southwardly on track B-28. It first had to go in an easterly direction and then to the south. On its return trip the engine went about fifteen car lengths before Tennant's

body was discovered. His body, except for his head and right hand, was found at the B-28 divide switch, on the outside of the west rail of track B-28, right at the switch. His head and right hand were missing. The engine was stopped seven or eight feet north of the body. Members of the crew then walked southwardly and found Tennant's lantern, still lighted, and his right hand, his cap and a large pool of blood about seven or eight car lengths south of the point where his torso had been found. The pool of blood was close to the west rail of the track, a few feet away from the lantern, right hand and cap. The place where the hand, cap, lantern and pool of blood were found was about the place where the engine had stopped in coupling up track B-28. That is, it was about the farthest point south that the engine had been in doing the coupling work mentioned, all movements of the engine after that being to the north and northwest. The crew then went back north with the engine a distance of about fourteen car lengths north and west of the place where the torso was found, and there found Tennant's head lying in a switch frog of the track. That is to say, the torso was found at switch B-28; the head was found about fourteen car lengths north and west of switch B-28, and the right hand, cap and lantern were found seven or eight car lengths south of switch B-28.

"Cole, the fireman, testified, as defendant's witness, that the engine bell was not ringing as the engine started to back out on the lead; that he did not see Tennant walk around on his side while the train was standing there; that he was not looking all the time, but when the engine started in reverse, pulling the cars out of the track, he was keeping a lookout. On cross-examination he was interrogated as to his testimony in his deposition wherein he had stated that he was keeping a lookout on the east side, with his window open, leaning out so he could glance one way or the other; that there was some wait after the cars had been coupled up, and at that time he was sitting on the east side of the engine and keeping a lookout and did not see Tennant on his side of the engine; that Tennant never walked down past him; and he testified at the trial that this testimony in his deposition was correct.

"One Keeler, defendant's assistant superintendent, who at the time of the casualty was chief clerk to the superintendent, testified, as defendant's witness, that he made an investigation of the accident and found some blood on the west rail of track B-28 near Tennant's right hand and lantern, and that near the hand there was a small galvanized steel spring about two inches in diameter and about ten inches long. He said he looked at the bottom of Tennant's shoes to see whether there was any grass or anything that might have caused him to slip, and inspected the engine and footboard to see if there was any evidence of leather having slipped along the edge of the footboard, but could find nothing to indicate anything of the sort. He testified that he inspected all the wheels of the cars and found only a tiny bit of flesh on the outside rim of the north wheel of the third car from the engine, a bit of flesh possibly a quarter of an inch in diameter; that he found no blood on any of the wheels of the engine. He said there was no evidence on either of the footboards or any other part of the engine of any one having slipped.

"Defendant's witness Romann, its general roundhouse foreman, testified that on the night of July 12, 1940, after the casualty, he made an inspection of the engine and found no blood or flesh on the wheels and no evidence of any shoe slipping on either of the footboards. And defendant's witness Maloney, its assistant chief car inspector, testified that that night, after the casualty, he examined all of the wheels of the cars that had been on track B-28 at the time of Tennant's injury and found only a speck of flesh on a wheel of one car."

As noted, we have adopted plaintiff's version of the proof relative to the accident. In addition, there are other circumstances not disputed which should be mentioned. England testified that on all previous nights Tennant, after making the first coupling, would go north around the engine and show up at the B-41 switch. After the cut had cleared that switch, he always got a signal from Tennant to proceed. That was the routine thing on all previous nights that Tennant worked as a member of this crew. Tennant's duties, after he had made the first coupling, were to attend to the switches and take care of his own safety. After the engineer had received the back-up signal, it was the custom for the foreman and field man to cut across the yards over to the hammer track. Under such circumstances, Tennant had nothing to do

with relaying the signal. England further testified that he thought Tennant had gone on to the 41 switch, as he had done on each previous night.

Harkless testified that after the first coupling, the next duties of Tennant were to walk back and see that the switches were lined and stay with the engine and exercise care for his own safety. Both Harkless and defendant's roundhouse foreman, Romann, testified in effect that before moving the Diesel engine it was necessary to release the air, throw the engine in reverse and open the throttle, and that when the air was released it made a hissing or whizzing noise which could be heard from fifty to seventy-five feet. Both the engineer and fireman testified that they were keeping a lookout as the engine moved in a northerly direction and did not see Tennant. Neither they nor any other member of the crew or any other person heard any sounds or outcries and had no knowledge as to the manner in which Tennant lost his life. Harkless and Bonner, after riding a short distance on the cars near the rear of the train, got off and walked over to the west, where the next switching operation was to take place. All members of the crew testified that they assumed Tennant was following his usual and ordinary duties. The engine had a footboard, and hand-holds at each end which were in proper condition.

Plaintiff's statement that the place where the right hand, cap and pool of blood were found was seven or eight car lengths south of B-28 switch, or at about the same point the engine stood prior to its backward movement, is based upon the testimony of its witness Harkless. England placed the distance where the engine stood as five or six car lengths south of the switch. Neither of these witnesses, however, had measured the distance. Defendant's chief engineer, who made measurements, testified that the distance from the switch to the point farthest south, where blood was found, was 317.6 feet.

This brings us to the sharply controverted issue as to whether defendant's failure to ring the engine bell at the time of the backward movement, during which plaintiff's intestate lost his life, constituted negligence. In other words, was defendant under a duty to the deceased by reason of Rule 30 to ring the bell at that time and place? Plaintiff contends that by the express language of the rule, the duty was so imposed. On the other hand, it is contended by defendant that the rule itself is not susceptible of such construction and, furthermore, it was the universal practice and custom, known to plaintiff's intestate as well as to all other members of the crew, that the bell was not to be rung under the circumstances attending this movement. Rule 30 provides: "The engine bell must be rung when an engine is about to move and while approaching and passing public crossings at grades, and to prevent accidents." Also Rule 32, introduced by the defendant, provides: "The unnecessary use of either the whistle or the bell is prohibited." It is claimed that this rule modifies Rule 30, or at any rate must be considered in its interpretation.

Harkless,[1] the crew foreman, was the only witness offered by the plaintiff who testified concerning either the circumstances attending the unfortunate accident or the custom and practice with reference to the application of the rules relied upon. On the other hand, more than a score of witnesses, in addition to members of the instant crew, testified rather emphatically that the practice and custom was for the engineer, upon receiving a signal to proceed, to move the engine without the ringing of a bell unless he had knowledge that some person was in a position of danger. Here again we must consider the proof in the light most favorable to the plaintiff, even though it appears that the testimony of Harkless concerning the custom and practice as to the ringing of the bell is in the main contradicted by all the other testimony in the case, and even though his testimony on several essential matters is either contradicted or repudiated by his cross-examination.

The testimony of Harkless on this feature of the case is stated in plaintiff's brief thus:

"Harkless testified that it was the practice and custom in this yard to ring the bell before starting an engine, and that when a member of the crew was missing the practice and custom was to stand still, not to move a car or engine when a member of the crew is missing; that such was the custom and practice at that time. On cross-examination he testified that it was

---

[1] Harkless himself had an unsettled claim against defendant, concerning which some difficulty arose. He had been demoted from his foreman position to that of a switchman.

the custom and practice in those yards to ring the bell whenever the engine stops and starts; that in coupling operations some men rang the bell and some didn't, but a majority of them did. He was interrogated by defendant's counsel as to defendant's Rule 32—subsequently introduced in evidence by defendant—providing that 'the unnecessary use of either the whistle or bell is prohibited.' He said that rule meant that continual ringing of the bell in the yard was prohibited. On redirect examination he testified that his superiors had never told him that there was any modification of Rule 30, but had told him that it must be obeyed, and that that was true down to the day of the accident; that when an engine had stopped on a track and was about to start in motion they would always ring the bell. And he testified that, while constant ringing of the bell is prohibited, when you are about to start up, under the requirement of Rule 30, the bell must be rung; that the ringing of the bell of a standing engine, preparatory to starting, was meant as a warning to everybody around the engine that it was about to move."

. Harkless, in testifying that it is the practice and custom not to move an engine when a member of the crew is missing, gave no explanation as to what is meant by "missing." Other witnesses, however, testified that a "missing" member is one out of place, or one who the engineer knows to be in a place of danger or known not to be performing his duties. Harkless admitted on cross-examination that it was not the practice to ring the bell when an engine moved forward to connect up the next group of cars on a track, and he stated that the ringing of the bell depended upon whether the engineer knew somebody was in a position of danger. He stated that a majority of engineers rang the bell, and admitted that his engineer, England, did not ring the bell while the train was being coupled. He testified to the same switching operation on the night prior to the accident and stated he did not remember whether the bell was rung after England received the signal to pull the cars from the switch. In his cross-examination, the following questions and answers appear:

"Q. How many of the nights prior to July 12 in that period would you say that you heard England ring the bell when he backed that cut out of track B-28? A.

Well, he rang it some of the time, probably half of the time.

"Q. When he rang it, for what purpose, if you know, did he ring the bell? A. Well, to warn other crews of engines—of other engines—and pedestrians around, yard clerks.

"Q. But the men on your crew were supposed to know all about the movement, and did know all about the movement, didn't they? A. They knew all about the movement, yes."

Plaintiff also calls attention to certain isolated statements, removed from their context, made by certain of defendant's witnesses which it is claimed support her case that it was customary to ring the bell. It would unduly prolong this opinion to discuss the defendant's evidence in detail. We think that the so-called admissions which plaintiff claims to have obtained from these witnesses on cross-examination have little significance when considered in connection with their testimony as a whole. Briefly, however, we shall mention a few of these so-called admissions. It is pointed out that Keeler, defendant's assistant superintendent, admitted on cross-examination "it was always necessary to ring the bell when the engine was about to move." It is plain, however, that the witness had reference to the requirement that the bell be rung upon passing public crossings, or to warn persons other than members of the crew and to warn the latter when known to be in a position of danger. It is true, also, as plaintiff points out, that a number of witnesses admitted on cross-examination that the rules were to be obeyed, but this admission is somewhat deceptive unless qualified by the testimony of such witnesses that they were to be obeyed in accordance with the custom and practice of the yard. The testimony of fireman Cole is illustrative of this class of witness. True, he testified on cross-examination that the written rules of the company must be obeyed. A reading of his testimony demonstrates without doubt that the rule was to be obeyed in accordance with the custom and the interpretation placed thereon by the railroad officials and the employees. Concerning this custom, there appears in his testimony the following:

"Q. Under the instructions that you received, on what occasions was the bell to be rung by engines switching in the East Peoria yards? A. In case anybody is in

danger of getting hurt or injured close to the track, or walking across the track, any person.

"Q. Was that somebody that the engineer or the fireman could see were in a position of danger? A. Sure.

"Q. Was the rule invoked to require ringing of bells when the engineer or fireman didn't see anybody was in a position of that kind? A. No, sir."

We find nothing in his testimony, including his cross-examination, inconsistent with that just quoted.

Hancock, an engine foreman, admitted that the superintendent's instructions as to the use of the bell made no distinction between a member of the crew and a trespasser in the yards. The importance of this admission is of doubtful value when considered in connection with the questions and answers which immediately follow. They are:

"Q. As far as any warnings to do— when an engine was about to move, they were made to warn everybody and save human life? A. The movements of the engine were supposed to be understood by all members of the crew.

"Q. Whether they were so understood, you couldn't tell if you were an engineer? A. If he receives a signal to move, he understands every man is in a position to protect himself."

As stated, the overwhelming weight of the testimony is to the effect that Rule 30 had long been interpreted to apply to members of a switching crew only in case a member was known to be in a position of danger. To the same extent, it was also shown that such was the custom and practice, not only of the instant crew but of the many other switching crews operating in this yard. However, we have purposely, as plaintiff is entitled to have us do under the law, related the facts in the light most favorable to her and to a large extent ignored the testimony of defendant's witnesses except wherein some admission was made which plaintiff relies upon as favorable. Plaintiff argues that Rule 30 is clear and explicit and that defendant is bound by it, irrespective of any custom or practice. In so arguing, plaintiff refers only to the first phrase of the rule, "the engine bell must be rung when an engine is about to move," and ignores the remainder of the sentence, "and while approaching and passing public crossings at gates, and to prevent accidents."

We doubt that this rule is so free from ambiguity as to put it beyond the bounds of an interpretation such as contended for by the defendant. True, in Montgomery v. Baltimore & O. R. Co., 6 Cir., 22 F.2d 359, 360, the court held, with reference to a similar rule although worded somewhat differently, that it was "intended as well for the protection of employees on and about the engine as for the protection of persons upon the track," and that the jury might infer negligence from the fact that the engine was moved without complying with the rule. The court pointed out that "it would require clear proof of established custom to justify treating this rule as not intended for the benefit of employees on the engine or tender." In that case, there was no proof of a custom inconsistent with the rule such as we have in the instant case.

◼ We are not unmindful of the rightful reluctance of trial courts to take from a jury the question of the defendant's negligence in cases such as this, as well as those of similar character. That such reluctance is justifiable is shown by two recent opinions of the Supreme Court, each of which involved a suit under the Federal Employers' Liability Act. Seago, Administratrix v. New York Central R. R. Co., 315 U.S. 781, 62 S.Ct. 806, 86 L.Ed. 1188, and Tiller, Executor, etc. v. Atlantic Coastline R. R. Co., 63 S.Ct. 444, 87 L.Ed. ——, decided February 1, 1943. The former is a Per Curiam opinion, reversing a decision by the Supreme Court of Missouri, 155 S.W.2d 126, on the ground that the evidence of negligence was sufficient to take the case to the jury. The latter case reversed a decision of the Fourth Circuit Court of Appeals, 128 F.2d 420, largely upon a holding that the assumption of risk doctrine was no longer in any form available as a defense. In such reversal, however, the court expressed the opinion that the evidence of negligence on the part of the defendant should have been submitted to the jury. We have carefully studied these opinions, as well as the opinions of the courts from which these cases went to the Supreme Court (the Supreme Court of Missouri in the former and the Fourth Circuit in the latter), particularly as to the facts concerning negligence. While the facts of these cases are distinguishable, they leave little room for doubt that any

proof of negligence, however slight, is sufficient to present a jury question.

██ ██ Although in the instant case the great preponderance of the proof was to the contrary, we are not prepared to hold as a matter of law that there was no negligence in defendant's failure to ring the bell. However, assuming there was negligence in this respect, that alone was not sufficient to take the case to the jury. That brings us to the even more doubtful element as to whether such negligence, in whole or in part, was the cause of the death of plaintiff's intestate. The requirement in this respect is stated in Atchison, T. and S. F. Ry. Co. v. Toops, Administratrix, 281 U.S. 351, 354, 50 S.Ct. 281, 282, 74 L.Ed. 896: "But proof of negligence alone does not entitle the plaintiff to recover under the Federal Employers' Liability Act. The negligence complained of must be the cause of the injury. The jury may not be permitted to speculate as to its cause and the case must be withdrawn from its consideration unless there is evidence from which the inference may reasonably be drawn that the injury suffered was caused by the negligent act of the employer. [Citing cases.]"

We have carefully studied the arguments of the parties as presented in their briefs, as well as all the testimony contained in the record, and are forced to the conclusion that no rational inference can be drawn that the failure to ring the bell was the thing which resulted in the unfortunate accident. Before such inference can be indulged, there must be proof supporting a reasonable theory that his death was occasioned by failure of the defendant to warn him of the train movement. Numerous theories are advanced in an effort to explain the deceased's presence beneath the wheels of the train. All of them are highly speculative.

Plaintiff's theory in connection with the failure to ring the bell is stated in her brief as follows: "The only inference, indeed, that may be rationally drawn from the above-mentioned testimony of the other members of the crew is that Tennant was north of the rear of the engine, on or about the track, and hidden from the view of the other members of the crew, when the engineer suddenly put the engine in motion, without the ringing of the engine bell; and that by reason of such sudden backward movement of the engine without warning Tennant was then and there run upon and killed. Had Tennant been on the west side of the track, his light would have been visible to both Harkless and Bonner. Had he been on the east side of the track, he would have been seen by the fireman. The engineer admits, indeed, that he knew that Tennant, when last seen, was walking around the engine to the rear or north side thereof, yet when he received a back-up signal he at once sent his engine backward so as to occupy that very place without giving the warning required by the rule."

At another point in her brief, we find this statement: "And there is not a scintilla of evidence that he was on either the front or south footboard of the engine when it started up on this reverse movement."

Later, in a supplemental brief, plaintiff states: "Reference has been made to the rule providing that employees must not stand on the track in front of an approaching engine or car for the purpose of boarding the same, but there is not a scintilla of evidence that Tennant stood in front of an approaching engine for the purpose of boarding it."

According to this theory, if it can be thus dignified, the deceased was some place north of the engine, "on or about the track and hidden from the view of the other members of the crew," but positively he was neither standing on the footboard of the engine nor in front (rear) of the engine for the purpose of boarding it. This theory advanced by plaintiff's counsel demonstrates, so we think, that the location of the deceased, as well as what he was doing at the time the engine commenced its movement, is as great a mystery to counsel as it is to all others. The engineer testified that it was about five or ten minutes from the time he last saw the deceased going to the north of the engine until he received the signal to move. It is undisputed but that the deceased at that time had no further duty to perform on or about the engine and that he was next required to be at switch 41. With his lighted lantern, he could of course have been seen by the engineer on one side and by the fireman from the other side any place north of the engine except at a point near the center of the track and close to the engine.

All members of the crew, including Harkless, testified that there had been from six to eight movements of the engine in the switching operations just prior to the fatal movement, and that the bell was not

868

·rung on any of these occasions. · The proof also discloses, without any evidence to the contrary, that the deceased had no further duty to perform on or about the engine after he was last seen by the engineer and that his next duty required his presence at switch 41. It is also shown without dispute that it was the custom of the deceased night after night to leave the engine and walk down the track to this switch. The engineer naturally assumed that he had done likewise on this occasion. It must be assumed, so we think, that the deceased knew, as did all other members of the crew, that the coupling of the cars had been completed, that the next movement would be to the rear, and would start upon the engineer receiving the back-up signal from Harkless. It is inconceivable that deceased with such knowledge would stand on the track in front of the engine, as suggested by plaintiff, and at a place where he had and could have had no duty to perform. This unreasonable inference, if accepted, to be of benefit to the plaintiff must be supplemented by the further inference, even more unreasonable, that the cause of the deceased's injury, as he stood in this known place of danger with knowledge that the engine was shortly to be moved in his direction, was defendant's failure to ring the bell as a warning.

Plaintiff advances the presumption that the deceased relied upon the observance of the rule with reference to the ringing of the bell, and upon the presumption that he was in the performance of his duty at the time of his death. Cases[2] cited in support of such presumptions are of little, if any, help in the instant case. A study of such cases indicates that such presumptions are indulged in in the absence of evidence to the contrary. There is no dispute in the evidence but that the deceased was not in the performance of duty at the time of his death, and we are of the view that the presumption that the deceased was relying upon the engine bell as a warning was entirely overcome by the facts and circumstances of the case.

A discussion of all the numerous theories as to the manner in which deceased met his death would unduly prolong this opinion and perhaps serve no useful purpose. We have deliberately discussed plaintiff's theory, assuming that it was the most plausible

from her standpoint. If we were to make a guess as to what happened, it would be one not suggested by either party, and that is that the deceased seated himself on the footboard of the engine and fell asleep. At any rate, this is a more reasonable explanation than that advanced by the plaintiff.

Plaintiff's theory as discussed is predicated on the inference that the deceased was in front of and run over by the engine. One of defendant's theories is that the deceased, after last seen by the engineer, walked in front of the engine and along the east side to a point south of the engine, and that in some manner he was killed while attempting to climb back through the cars to the west side of the train where the other members of the crew were located. In support of this theory, it is pointed out that although a careful inspection was made of the wheels of the engine and cars, no evidence of blood or flesh was found on the wheels of the engine or the first two cars. Flesh was found on the front wheels of the third car from the engine. Plaintiff relies upon a number of circumstances which it is argued dispel such a theory. It is pointed out that both the engineer and Harkless testified that the deceased's cap and lantern and the pool of blood were found about where the engine had stood. Neither of these witnesses had measured the distance. The engineer also stated that the engine prior to the movement in question was located five or six car lengths south of switch B-28 or a distance of from 200 to 240 feet. Defendant's chief engineer measured the distance from the switch south to where the blood was found and testified the distance as being 320 feet. It would appear from this calculation that the blood was found a distance of from 80 to 120 feet south of where the engine stood prior to the fatal movement. This theory as to where the deceased was located with reference to the engine at the time he was run over is more reasonable than that advanced by the plaintiff. This is so, notwithstanding the testimony of the fireman that the deceased did not pass around his side of the engine. It is not difficult to construe this statement as meaning no more than that he was not seen to pass around that side. If this theory were accepted, however, it would still

2 Worthington v. Elmer, 6 Cir., 207 F. 306; New Aetna Portland Cement Co. v. Hatt, 6 Cir., 231 F. 611; Director General of Railroads v. Templin, 3 Cir., 268 F. 483.

be merely a guess as to whether the failure to ring the bell had any connection with the accident. Under this situation, there is not a scintilla of evidence from which it can be inferred as to whether he was on or under a car when the movement started, or undertook to cross over subsequent thereto.

We think we have sufficiently discussed the various theories as to the cause of the decedent's death, particularly plaintiff's theory, to demonstrate that it is shrouded wholly within the realm of speculation and conjecture. As the Supreme Court has held in numerous cases, the situation was such as to require a directed verdict. In Gulf M. and N. R. Co. v. Wells, 275 U.S. 455, 48 S.Ct. 151, 72 L.Ed. 370, the court in reversing a judgment for the plaintiff for failure to direct a verdict, on page 459 of 275 U.S., on page 153 of 48 S. Ct., said:

"In short, we find that on the evidence and all the inferences which the jury might reasonably draw therefrom, taken most strongly against the Railway Company, the contention that the injury was caused by the negligence of the engineer is without any substantial support. In no aspect does the record do more than leave the matter in the realm of speculation and conjecture. That is not enough."

In numerous cases, wherein the cause of injury could be attributed to any one of numerous things or where the proof gives equal support to inconsistent inferences, the Supreme Court has reached the same result. As was said in Patton v. T. & P. Ry. Co., 179 U.S. 658, 663, 21 S.Ct. 275, 277, 45 L.Ed. 361: "And where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employe is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs."

Again, in Pennsylvania R. R. Co. v. Chamberlain, 288 U.S. 333, 339, 53 S.Ct.

391, 393, 77 L.Ed. 819, the court said: "We, therefore, have a case belonging to that class of cases where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover. [Citing cases.]"

As heretofore stated, the case was submitted to the jury solely upon the charge that the defendant was negligent in its failure to ring the bell, in violation of Rule 30. The record fails to indicate that plaintiff made any objection or took any exception to the manner in which the case was submitted; in fact, the record, as well as plaintiff's brief in this court, indicates that the issue as submitted was approved, if not actually initiated, by the plaintiff. Under such circumstances, the case here must be decided upon the issue which was tried and decided by the court below. New York, L. E. & W. R. Co. v. Estill, 147 U.S. 591, 13 S.Ct. 444, 37 L.Ed. 292; Duignan v. United States, et al., 274 U.S. 195, 200, 4 S.Ct. 566, 71 L.Ed. 996; Becker Steel Co. of America v. Cummings, 296 U.S. 74, 80, 56 S.Ct. 15, 80 L.Ed. 54.

We therefore must conclude that there is no substantial proof in support of the charge that defendant's failure to ring the bell was the proximate cause of the death of plaintiff's intestate and that the court should have directed a verdict in favor of the defendant, or allowed defendant's motion for judgment, notwithstanding the verdict.

The judgment is reversed and the cause remanded, with directions to the District Court to enter judgment in favor of the defendant.

KERNER, Circuit Judge. (dissenting).

Any movement of the engine without warning was dangerous to life and limb. In addition to the fact that no bell was rung at the time the engineer started to move the engine and that he did not know where Tennant was, there was also evidence that it was the practice and custom not to move an engine when a member of the crew was missing unless the bell was rung as a warning before starting the engine.

I think it was a permissible inference by the jury that the failure to sound the bell

was the proximate cause of Tennant's death, and that the inference to be drawn from all the evidence as to the existence of the custom, its purpose and the reliance which Tennant under all the circumstances was entitled to place upon it, was for the jury. Consequently, the judgment ought to be affirmed.